UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Ronald Nunn and Donald Vaden,<br>    *Plaintiffs*,<br><br>        *v.*<br><br>Massachusetts Casualty Ins. Co.,<br>    *Defendant.* | Civil No. 3:10cv1350 (JBA)<br><br><br><br>September 10, 2012 |

RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Massachusetts Casualty Insurance Company ("Massachusetts Casualty"), now known as Centre Life Insurance Company, moves [Doc. # 56] for summary judgment against Plaintiffs Donald Vaden and Ronald Nunn, who have asserted claims for breach of contract and contract reformation arising from two disability insurance policies issued by Massachusetts Casualty in 1996. Defendant also moves to strike an exhibit provided in Plaintiffs' memorandum in opposition to summary judgment. For the reasons that follow, Defendant's motion to strike is denied, and Defendant's motion for summary judgment is granted.

I.   Factual Background

In 1996, Plaintiff's Ronald Nunn and Donald Vaden were professional referees for the National Basketball Association ("NBA"), and members of the National Basketball Referees' Association ("NBRA"). Plaintiffs attended referee training camps in Secaucus, New Jersey. (*See* Def.'s Responses to Pl.'s Requests to Admit, Ex. 2 to Pl.'s Loc. R. 56(a)2 Stmt [Doc. # 60] ¶ 24.) On September 29, 1996, during the NBA's annual referee training camp, the NBRA held a meeting in Secaucus, New Jersey. (*See* Vaden Dep., Ex. A to Def.'s Loc. R. 56(a)1 Stmt [Doc. # 58] at 13:15–19, 14:24–15:20.) At that meeting, Mr. Steven Lucas, an

insurance policy salesman, made a presentation about disability insurance to members of the NBRA. (Nunn Dep., Ex. B to Def.'s 56(a)1 Stmt at 20:7–24:4.)

At the time of this presentation, Mr. Lucas was a duly appointed Sales Representative of Sun Life of Canada (U.S.) ("Sun Life"). Massachusetts Casualty had designated Sun Life as its administrator in connection with the distribution of disability income products, and as a result, Mr. Lucas was authorized to solicit applications for insurance policies offered by Massachusetts Casualty, including those policies issued to Plaintiffs. (*See* Stipulation as to Undisputed facts, Ex. C to Def.'s 56(a)1 Stmt [Doc. # 58–3] ¶ 1.)

During the presentation, Mr. Lucas represented to the audience that a "own occupation" disability insurance policy was going to be made available to members of the NBRA. This policy had been offered to members of the Major League Baseball ("MLB") Umpires Union (known as the World Umpires Association, "WUA").[1] Mr. Lucas described the policy in detail at the presentation before the NBRA. However, Massachusetts Casualty never confirmed that this particular WUA policy would be offered to members of the NBRA, (*See* Lucas Dep., Ex. 5 to Pl.'s 56(a)2 Stmt at 57:3–21), and Mr. Lucas testified at his deposition that he was "hopeful" that Massachusetts Casualty would offer the same policy to the NBRA members (*id.* at 90:16–91:6). At some point after the presentation but before Plaintiffs applied for the policy with Massachusetts Casualty, Lucas learned that NBRA members were not going to be offered the same policy that was sold to WUA members. (*See* Lucas Dep. at 154–55.) However, Mr. Lucas did not explain or clarify this issue to NBRA

---

[1] As it had been offered to the WUA, the policy promised to pay insureds' benefits to the age of sixty–five if the insured was unable to perform the duties of a MLB umpire, that is, his or her "own occupation," on account of illness or injury.

2

members, and in particular Mr. Lucas did not clarify for Plaintiffs that the definition of "disability" under the policy would change after sixty months of receiving benefits under the policy. (*See* Nunn Dep., Ex. 6 to Pl.'s 56(a)2 Stmt at 60:15–20; Vaden Dep., Ex. 4 to *id.* at 59:22–25.)

Plaintiffs applied for disability insurance policies with Massachusetts Casualty though Mr. Lucas. (Vaden Dep. at 60:20–22; Nunn Dep. at 59:21–60:1.) Mr. Lucas testified that the Plaintiffs never actually saw the policy they applied for until after the application was submitted (Lucas Dep. at 174:16–22), and that Mr. Lucas completed the application with Plaintiffs over the phone (*id.* at 170:4–7). In order to be considered for a policy, the application expressly disclosed to the applicant that "No Agent/Broker or medical examiner is authorized to do any of the following: (a) accept risks or pass upon insurability; (B) make, alter or modify the terms of this Application or any policy issued thereon; or (c) waive any of Massachusetts Casualty Insurance Company's rights or requirements." (Vaden and Nunn Applications, Exs. E, F at 3.)

A.   Issuance of Plaintiffs' Policies

On November 1, 1996, Messrs. Vaden and Nunn were issued policies with Massachusetts Casualty. (*See* Nunn Policy, Ex. E to Def.'s 56(a)1 Stmt; Vaden Policy, Ex. F.) Both Plaintiffs testified that they did not read the "entirety" of the policy applications that they signed. (Nunn Dep. at 24:20–25:12; Vaden Dep. at 32:5–10, 33:4–6.) In addition, both Plaintiffs testified that upon receiving their policies, they reviewed certain portions of their respective policies, but that they did not review the policies in their entirety. (*See* Nunn Dep. at 27:15–24.) Mr. Nunn testified that he "didn't feel that there was a need [to review his policy]. It was pretty clear how I understood Mr. Lucas's presentation. I am also not one to

3

read contractual situations of this nature. It's not my forte to read it and really process through something like this. If I thought there was something that was not well–understood, then I probably would give it to somebody to help me read it." (Nunn Dep. at 27:22–28:5.) Mr. Vaden testified that he reviewed page two of the policy, "just to make sure it was mine." (Vaden Dep. at 35:22–24.)

Plaintiffs' policies are identical in all material respects. In each, "total disability" is defined as follows:

> "Total Disability" and "totally disabled" means that due to Injury or Sickness, the Insured:
> 1. is unable to perform all the substantial and material duties of his/her occupation; but, after 60 successive months of total disability for which monthly benefits have been paid, and if such disability continues, the term shall then mean the Insured's substantial inability to perform the material duties of any gainful occupation for which he/she is suited, having due regard: (1) for his/her earning ability from the Policy Date; (2) for his/her education; (3) for his/her training; and (4) for his/her experience; and
> 2. is receiving care by a Physician which is appropriate for the condition causing the disability. We will waive this requirement when continued care would be of no benefit to the Insured.

(Policies, Exs. E, F to Def.'s 56(a)1 Stmt at 3.) Each policy included a notice period, pursuant to which purchasers were given ten days to review the policy in order to "fully understand and be entirely satisfied with [the] Policy." (*Id.* at 1.) The policies also contained an integration clause, which provided that the terms of the policy, not the statements of an agent, constituted the parties' contract. (*Id.*)

At his deposition, Mr. Lucas testified that the terms of the policy as he had described them were not consistent with the terms of the policies that he had sold to the NBA referees, including to Plaintiffs. (*See* Lucas Dep. at 12:22–13:4.) Specifically, Mr. Lucas admitted that

4

he had based his presentation on what had been done for the MLB umpires, and that "the definition of disability" differed materially between the two policies. Mr. Lucas testified:

> A. My understanding is that the MLB policy paid benefits to 65 in their own–occupation. . . . that means that if they couldn't perform the duties of their occupation, they would be paid to age 65.
> Q. Regardless of whether they could perform the duties of another occupation?
> A. That's correct.
> Q. And how is that different from your understanding of the NBA referees' policy?
> A. The NBA referees' policy provided own–occupation coverage for 60 months.
> Q. Is that—your understanding, is that the only difference between the policies?
> A. Yes.

(Lucas Dep. at 21:16–24, 22:1–14.)

B. Plaintiffs' Applications for Disability Benefits

On September 5, 2002, Mr. Nunn notified Disability Management Services of Massachusetts Casualty of his intention to submit a claim under the policy asserting that based on a knee impairment, he was no longer able to perform as a NBA referee. (*See* Higgins Decl., Ex. G to Def.'s 56(a)1 Stmt ¶ 6.) Mr. Nunn described his impairment as a "debilitating knee that got worse and worse," and that prevented him from running. (Nunn Dep. at 13:16–17.) Mr. Nunn continued to work for the NBA following his injury in various roles, though he no longer could serve as a referee. (Nunn Dep. at 11:9–12:14.) Pursuant to his disability claim and the terms of the written policy, Mr. Nunn began receiving benefits in June 2003 at the rate of $5,000 per month, and after sixty consecutive months of benefits were paid, benefit payments ceased in June 2008. (Higgins Decl. ¶¶ 7–8.) Over the sixty month period, Mr. Nunn received a total of $300,000 in benefit payments. (*Id.* ¶ 8.)

On May 15, 2003, Mr. Vaden notified Disability Management Services of his intention to submit a claim under the disability policy, asserting that due to a back impairment, he was no longer able to perform as a NBA referee. (Higgins Decl. ¶ 11.) Mr. Vaden testified that he "had a second surgery for a disc problem on the right–hand side, . . . where I was experiencing pain on my sciatica nerve on my right leg" (Vaden Dep. at 10:2–4.), which caused him to cease being a referee. Following his injury, Mr. Vaden continued to work for the NBA. (*Id.* at 6:11–20, 9:2–6, 9:18–10:23.) Mr. Vaden began receiving benefits in March 2004 at the rate of $5,000 per month (Higgins Decl. ¶ 12), and benefit payments to Mr. Vaden ceased in March 2009 after a total of sixty consecutive months of payments (*id.* ¶ 13).

Plaintiffs filed suit on August 25, 2010, alleging that Defendant breached a contractual obligation to pay their benefits. Plaintiffs stipulate that they do not presently meet the definition of "total disability" that is set out in the policies. (Stipulation of Undisputed Facts, Ex. C to Def.'s 56(a)1 Stmt ¶ 2–3.) Plaintiffs contend that the policies are "materially different" from what was described to them by Mr. Lucas,, and seek to reform the policies to conform with Mr. Lucas's representations and to reflect their "reasonable expectations." Defendants move for summary judgment on all claims.

II.  Discussion[2]

Defendant contends that Plaintiffs' claims are time–barred. All parties agree that Connecticut law provides the relevant statute of limitations for Plaintiffs' contract claims. *See Baxter v. Sturm, Ruger & Co.*, 230 Conn. 335, 340–41 (Conn. 1994) (if the limitation period is characterized as procedural, the *lex fori* applies); *see also Wilson v. Transport Ins. Co.*, 889 A.2d 563, 571 (Pa. Super. Ct. 2005) ("The long–standing rule of Pennsylvania is that the law of the forum determines the time within which a cause of action shall be commenced."). Next, Defendant argues that Pennsylvania law, which applies to the resolution of this motion, requires that clear and unambiguous contractual language must be enforced, and because the contractual language at issue was clear, the reasonable expectations doctrine, which provides that "courts should look to the reasonable expectations of the insured when considering the extent of coverage under [an insurance] policy," *Tonkovic v. State Farm Mut. Auto. Ins. Co.*, 521 A.2d 920 (Pa. 1987), is inapplicable to the present case. This Ruling first addresses Defendant's motion to strike, then the statute of limitations issue, and finally, the merits of Defendant's motion for summary judgment.

---

[2] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

A.   Defendant's Motion to Strike

Defendant moves [Doc. # 64] to strike Ex. 1 to Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment, which is a written transcription of an audiotape recording of Mr. Lucas's September 1996 presentation at the NBRA meeting in Secaucus, New Jersey. Defendant argues that neither the copy of the transcript, nor the copy of the recording, has been authenticated, and that therefore it should be excluded from consideration. Defendant also suggests that the recording was made in violation of state and federal law.

In response, Plaintiffs argue that the audio recording has been properly authenticated, as Mr. Lucas testified at his deposition that the audio recording contained his voice and was a fair and accurate depiction of his presentation. (*See* Lucas Dep. at 51:16–21, 32:1–19, 166:4–9.) "A tape recording may be admitted in evidence when it has been properly authenticated by evidence sufficient to support a finding that the matter in question is what its proponent claims." *United States v. Hamilton*, 334 F.3d 170, 186 (2d Cir. 2003). Because Mr. Lucas has identified his own voice and confirmed that it was a recording of the presentation he made to the NBRA on September 29, 1996, the Plaintiffs have satisfied the requirements of Federal Rule 901.[3]

In further support of proper authentication, Plaintiffs have offered an affidavit of the NBA referee, Mr. Greg Willard, who served as the union's secretary in September of 1996 and who states that he recorded that particular meeting on September 29, 1996. (*See* Willard

---

[3] In addition, included among the examples of authentication or identification conforming with the requirements of Rule 901 are "testimony of witness with knowledge," Rule 901(b)(1), and "identification of a voice . . . by opinion based upon hearing the voice at any time, 901(b)(5).

8

Aff. ¶¶ 2–5.) Mr. Willard states that he "routinely audio recorded NBRA meetings" (*id.* ¶ 4), and that "[d]uring the Solicitation, the audio recorder and microphone were in plain view" (*id.* ¶ 6).

Mr. Lucas had no expectation of privacy as he was making a presentation to a large group of people, including the Plaintiffs, and thus, the presentation was recorded in compliance with state and federal law. *See In re State Police Litigation*, 888 F. Supp. 1235, 1272 (D. Conn. 1995). In addition, according to Mr. Willard's affidavit, the recording equipment and microphone "were in plain view." (Willard Aff. ¶ 6.) The recording was made by a participant of the presentation, Mr. Willard, and therefore complies with the "one–party consent requirement" under both Federal and New Jersey Law.

For all of these reasons, Defendant's motion to strike Exhibit One of Plaintiff's Opposition is denied.

> B.   Whether Plaintiffs' Claims Are Time–Barred

The applicable statute, Conn. Gen. Stat. § 52-576(a), provides: "No action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues." "The defendant, in pleading a statute of limitations affirmative defense, bears the burden of proving that the plaintiff's claims are time–barred." *Milo v. Galante*, 2011 U.S. Dist. LEXIS 32092, at *22 (D. Conn. March 28, 2011) (citing *Staehr v. Hartford Fin. Servs. Group*, 547 F.3d 406, 426 (2d Cir. 2008)) ("The lapse of a limitations period is an affirmative defense that a defendant must plead and prove.").

### 1. *Breach of Contract Claims (Counts One and Two)*

The record is undisputed that Plaintiffs received their insurance policies in 1996 and did not file suit against Defendant until 2003. Connecticut has a six-year statute of limitations for breach of contract actions, and in an action for breach of contract:

> the cause of action is complete at the time the breach of contract occurs, that is, when the injury has been inflicted. Although the application of this rule may result in occasional hardship, "[i]t is well established that ignorance of the fact that damage has been done does not prevent the running of the statute, except where there is something tantamount to a fraudulent concealment of a cause of action.

*Toldbert v. Conn. Gen. Life Ins. Co.*, 257 Conn. 118, 124–25 (2001) (internal citations omitted).

In *Tolbert*, the plaintiff–mortgagor alleged breach of contract when her insurance company that was supposed to continue making payments towards her mortgage account once she became "totally physically disabled" stopped making these payments and plaintiff faced foreclosure proceedings. The defendant argued that the plaintiff's claims were time-barred, as her cause of action would have accrued in 1975, when she first received the policy, not when her insurance company ceased making payments in 1990. The Connecticut Supreme Court agreed, and noted that:

> in the present case, the procurement of inadequate insurance, which constituted the alleged breach of the contract, would have resulted in legal damage as soon as it occurred. Indeed, the injury allegedly caused by Hartford Federal had to have been inflicted at the time Hartford Federal procured a mortgage disability policy for the plaintiff in September, 1975, because that policy was either adequate or inadequate *at that time*.

10

*Id.* at 125 (emphasis in original). The Supreme Court noted, however, that in cases where "something tantamount to a fraudulent concealment of a cause of action" has been alleged, this rule would not apply. *Id.*

Though Plaintiffs assert that the cause of action did not accrue "until Mass Casualty breached the parties' agreement by ceasing to pay disability benefits to the Plaintiffs after 60 months," and that the Plaintiffs' reasonable expectations of their policies are considered part of the parties' agreement under Pennsylvania law (Pl.'s Opp'n at 29), Plaintiffs are conflating two separate issues. The question of the Plaintiffs' reasonable expectations of the substance of the policy's coverage, based on the representations made by Mr. Lucas, are separate from the issue of *when* their breach of contract cause of action accrued.

Plaintiffs also argue that the "breach" that Defendant claims occurred upon delivery of the insurance policies in 1996 was merely an anticipatory breach, as "there is no dispute that Mass Casualty continued to perform all of the duties required of it under Lucas's conception of contract until June 12, 2008 and March 31, 2009, respectively." (Pl.'s Opp'n at 30.) In cases of anticipatory repudiation, the non–breaching parties "may either opt to afford the repudiator an opportunity to recant and perform by awaiting performance, in which case the accrual date of the cause of action and the triggering of the statute of limitations are accelerated from the time of performance to the date of such election." *Total Control, Inc. v. Danaher Corp.,* 359 F. Supp. 2d 387, 393–94 (E.D. Pa. 2005).

The factual record does not support Plaintiffs' argument that Defendant's issuance of the inconsistent policy in 1996 could have instead been an opportunity for Defendant to "recant and perform," as in the cases of anticipatory breach. Rather, the record is undisputed that Defendant's policy unequivocally stated, at the time Plaintiffs received it, what the

11

extent of it coverage would be, and Defendant's action on the policy was consistent with the policy's written terms. Under *Tolbert*, the limitations period for Plaintiffs' breach of contract claim began to run in 1996, and ran out in 2003. Plaintiffs have made no allegation of "something tantamount to a fraudulent concealment of a cause of action," and thus, Plaintiffs are time–barred from asserting their breach of contracts claims. Defendants are therefore entitled to summary judgment on Counts One and Two.

### 2. Reformation (Counts Three and Four)

Defendant also asserts that Plaintiffs' claims for reformation (Counts Three and Four) are similarly barred by the statute of limitations. An action for contract reformation is an equitable action, and "[e]quity ordinarily will refuse a remedy when the statute applying to similar actions at law has run." *Lesser v. Lesser*, 134 Conn. 418, 423 (Conn. 1948). In an action for reformation of a contract, Connecticut state trial courts generally "have applied the statute of limitations applicable to actions on contract." *Kelley v. Five S Group, LLC*, No. HHDCV085023936S, 2011 WL 782725, at *11 (Conn. Sup. Ct. Feb. 1, 2011).

Plaintiffs assert that even if the Court were to find that the limitations period had run, the Court still has the authority to reform the parties' contracts under the circumstances of this case under its powers of equity. As equity "may give a remedy after the statute has run," *id.* (citing *Lesser v. Lesser*, 134 Conn. 418, 423 (1948)), the Court will consider whether Plaintiffs' claims are barred by the doctrine of laches.

The components of a laches defense are similar under Connecticut and Pennsylvania law: a defendant must demonstrate both (1) an inexcusable delay and (2) prejudice. *See, e.g., Papcun v. Papcun*, 181 Conn. 618, 620 (Conn. 1980); *Class of Two Hundred Admin. Faculty Members v. Scanlon*, 466 A.2d 103, 105 (Pa. 1983). In its Reply, Defendant counts a nearly

fifteen–year delay, starting from the 1996 policy issuance date until the date of the filing of this suit in August 2010, and contends that this delay is "inexcusable," but cites to no legal authority to support this contention. Defendant also claims that it has suffered prejudice, in that "each of the plaintiffs received at least $300,000 in benefits under the terms of the policies. . . . To suggest that the plaintiffs, while harboring a belief that the policies were issued as the result of a mistake, could knowingly accept such benefits under the policies without any consequences is itself unscrupulous." (Def.'s Reply [Doc. # 66] at 10.) There is no record support for Defendant's argument that Plaintiffs knowingly accepted benefits under policies that they knew to be inaccurate; rather, Plaintiffs assert that their injury only occurred once they did not receive the benefits (after sixty months) to which they believed they were entitled.

As the record does not support Defendant's claim of prejudice as a result of Plaintiffs' delay in filing suit, laches is inapplicable here. Plaintiffs' claims for reformation are thus not time–barred, and the Court will consider Defendant's motion for summary judgment on the merits.

      B.      The Merits of Plaintiffs' Reformation Claims

As both policies provide that Pennsylvania is the "contract state," and neither party disputes that Pennsylvania law governs, the Court looks to Pennsylvania law for the merits of Plaintiffs' reformation claims. In Pennsylvania, reformation "is an equitable remedy that is sparingly granted." *Twin City Fire Ins. Co. v. Pittsburgh Corning Corp.*, 813 F. Supp. 1147, 1149 (W.D. Pa. 1992). The Supreme Court, considering reformation as a remedy and the history of the courts of equity, has recently described:

13

> Equity courts, . . . would reform contracts to reflect the mutual understanding of the contracting parties where fraudulent suppressions, omissions, or insertions, materially affected the substance of the contract, even if the complaining party was negligent in not realizing its mistake, as long as its negligence did not fall below a standard of reasonable prudence and violate a legal duty.

*CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1881 (2011) (internal quotation marks and citations omitted). Plaintiffs contend that because they purchased the insurance policies based on their understanding of the policies as described to them by Mr. Lucas, the "reasonable expectations of the insured" doctrine should apply, and Defendant's motion should be denied.

The general rule in Pennsylvania is that courts are required to give effect to the language of contracts, including insurance policies, if that language is clear and unambiguous. However, "in certain situations the insured's reasonable expectations will be allowed to defeat the express language of an insurance policy." *Tram v. Met. Life Ins. Co.*, 408 F.3d 130, 136 (3d Cir. 2005). Pennsylvania law recognizes only two limited circumstances in which the reasonable expectations doctrine may overcome the clear language of a policy: (1) to protect non–commercial insureds from policy terms which are not readily apparent; and (2) to protect noncommercial insureds from deception by insurance agents. *See Century Sur. Co. v. QSC Painting, Inc.*, 2:08-CV-860, 2010 WL 891245, at *8 (W.D. Pa. Mar. 8, 2010) (citing *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 439–40 (3d Cir. 2006)). " Inherent in both circumstances is the requirement for some action on the part of the insurer to either unreasonably obscure the terms or outright deceive the insured. . . . Without evidence of such, the subjective expectations of the insured will fail to overcome the clear and unambiguous language of the policy." *Id.*

Plaintiffs argue that the reasonable expectations doctrine applies here because they are alleging that the insurer engaged in deceptive practices toward them. Citing *Tran v. Met. Life Ins. Co.*, 408 F.3d 130, 136 (3d Cir. 2005), Plaintiffs maintain that the misrepresentations of an insurance agent can defeat the otherwise unambiguous terms of the policy. In *Tran*, the Third Circuit reversed the district court's grant of summary judgment to the insurer, holding that the question of whether the plaintiff's reliance on the agent's allegedly fraudulent representations were justifiable needed to be presented to the jury.

The *Tran* case claimed fraud, negligent misrepresentation and violations of Pennsylvania's Unfair Trade Practice and Consumer Protection Law, and was brought by a plaintiff who had a limited understanding of English and who had relied on the representations of the insurance agent, who had gone over the terms of the policy with the plaintiff in Chinese. *Id.* at 133. As with the policies at issue here, Mr. Tran's policy included a provision titled "10–day right to examine policy." *Id.* The Third Circuit concluded that the reasonable expectation doctrine should apply, and that "Pennsylvania does not impose a duty to read insurance policies when insureds allege fraud." *Id.* at 136.

Here, Plaintiffs have not alleged any claims of fraud or negligent misrepresentation, and unlike the Third Circuit's conclusion in *Tran* that the policy language was ambiguous, 408 F.3d at 139 ("even if Tran had read his policy or had it read to him, an examination of the policy terms would not necessarily have revealed that Lam's alleged statements were false as to when premium payments would cease"), the record is undisputed that the language of the policies clearly and unambiguously states that the definition of disability changes after five years. It is also undisputed that Plaintiffs purchased these policies after hearing the representations of Mr. Lucas, an insurance agent, and that Messrs. Nunn and Vaden state

15

that they never read the policies once they received them, in spite of the fact that the issuance of the polices included a "notice period" during which they were to review the policy in order to "fully understand and be entirely satisfied" with it. (*See* Exs. E, F to Def.'s 56(a)1 Stmt) While this record suggests that Mr. Lucas may have been careless in presenting a description of a not–yet–existing policy that ultimately Defendant did not offer, unlike in *Tran*, Plaintiffs have not brought claims of fraud or misrepresentation, and Plaintiffs admit that they never even tried to review the terms of their policies. Viewing the record in the light most favorable to Plaintiffs, the Court concludes that the reasonable expectations of Plaintiffs cannot apply to their policies, and that the general rule that courts should give effect to the unambiguous language of contracts, including insurance policies, *Tran*, 408 F.3d at 136, should apply here.

However, even if the Court considered Plaintiffs' reasonable expectations, their claims for contract reformation do not withstand summary judgment. Reformation is an equitable remedy that is sparingly applied, and here, there has been extreme delay in filing suit—nearly fifteen years after the receipt of the "flawed" policies—and no claims of fraudulent "suppressions, omissions, or insertions" materially affecting the contract, or a showing of mutual mistake. *CIGNA Corp. v. Amara*, 131 S. Ct. at 1881. Thus, reformation is not warranted here. Accordingly, Defendant is entitled to summary judgment on Plaintiffs' remaining claims.

III.    Conclusion

For the reasons discussed above, Defendant's motion to strike [Doc. # 64] is DENIED and Defendant's motion for summary judgment [Doc. # 56] is GRANTED. The Clerk is directed to close the case.

                                IT IS SO ORDERED.


                                _____/s/_____
                                Janet Bond Arterton, U.S.D.J.

        Dated at New Haven, Connecticut this 10th day of September, 2012.